246 P.3d 1 (2010)
238 Or. App. 702
Jeffrey E. BOLY, Plaintiff-Appellant,
v.
THE PAUL REVERE LIFE INSURANCE COMPANY, a Massachusetts corporation, Defendant-Respondent.
070505898; A139842.
Court of Appeals of Oregon.
Argued and Submitted April 14, 2010.
Decided November 17, 2010.
Jeffrey M. Batchelor, Portland, argued the cause for appellant. On the briefs were Christopher T. Carson and Kilmer, Voorhees & Laurick, P.C.
Robert B. Miller argued the cause for respondent. With him on the brief was Bullivant Houser Bailey, PC.
Before SCHUMAN, Presiding Judge, and WOLLHEIM, Judge, and ROSENBLUM, Judge.
SCHUMAN, P.J.
Plaintiff is insured under a disability policy issued by defendant. The policy provides lifetime benefits for disability resulting from an accidental injury, but benefits end at age 65 for disability resulting from disease or sickness. Plaintiff's disability is cognitive impairment caused by the cumulative effect of hypoxialack of oxygen to the brainthat occurred during incidents of undiagnosed sleep apnea. When plaintiff turned 65, defendant cut off his benefits on the ground that the cognitive impairment resulted from a disease: sleep apnea. Plaintiff brought this action for breach of contract and for a declaratory judgment, arguing that the impairment resulted from a brain injury: hypoxia. The court ruled that defendant's characterization of the condition was correct and granted defendant's motion for summary judgment. Plaintiff appeals, and we affirm.
In an appeal from the grant of summary judgment, we review the record in the light most favorable to the nonmoving party, here plaintiff, to determine whether any genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. Jones v. General Motors *2 Corp., 325 Or. 404, 420, 939 P.2d 608 (1997). "No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party." ORCP 47 C. We therefore recite the facts in conformity with plaintiff's averments that are supported by evidence in the summary judgment record and then determine whether, even under those facts, defendant is entitled to a judgment as a matter of law.
In 1983, plaintiff, then a practicing tax attorney, bought a disability income insurance policy from defendant. Some years later, plaintiff experienced repeated daytime sleepiness and was eventually diagnosed with sleep apnea and narcolepsy. Plaintiff's doctor treated those disorders and stabilized plaintiff's nighttime sleeping, but the daytime tiredness persisted and interfered with plaintiff's ability to work. Based on his reduced productivity, plaintiff successfully applied for partial disability benefits from defendant.
Plaintiff continued to suffer diminished work capacity, and he also began to notice cognitive deficits. In 1996, plaintiff was evaluated by a clinical neuropsychologist, Dr. Friedman, who determined that the deficits stemmed from nighttime cessation of breathing that had occurred before plaintiff's sleep apnea was diagnosed and treated. According to Friedman, "the most likely etiology for these neuropsychological findings was chronic, nocturnal hypoxia associated with sleep apnea before effective treatment was initiated."
In 2006, the year before his sixty-fifth birthday, plaintiff requested that his disability be reclassified as resulting "from injury," rather than "from sickness." He based that request on policy definitions. "Sickness" was defined as "sickness or disease which first manifests itself after the Date of Issue and while Your Policy is in force." "Injury" was defined as "accidental bodily injury sustained after the Date of Issue and while Your Policy is in force." The policy did not define the term "accidental." Defendant had doctors examine plaintiff's medical records, and, like plaintiff's doctor, they concluded that, to the extent that plaintiff was suffering a disabling cognitive impairment, it resulted from sleep apnea and narcolepsy. Based on that finding, defendant discontinued plaintiff's disability benefits on his sixty-fifth birthday.
Plaintiff then brought this action against defendant, seeking reinstatement of total disability benefits and a declaratory judgment securing those benefits for his lifetime. Defendant moved for summary judgment. The court granted defendant's motion, explaining that plaintiff's nocturnal hypoxia was "the natural progression (or consequence) of [plaintiff's sleep apnea] disease":
"The cognitive deficit experienced by the plaintiff is a well known and understood consequence of sleep apnea induced hypoxia. The natural progression of an illness and the characteristic damage associated with that particular illness are all included within the definition of the `sickness or disease' language of the contract. What separates those situations from accidental bodily injuries is not the mechanism or nature of the damage, but rather the predictability (or foreseeability) of the injury."
This appeal ensued.
We interpret terms in an insurance policy according to the parties' intentions. Totten v. New York Life Ins. Co., 298 Or. 765, 770, 696 P.2d 1082 (1985). To determine their intent, we consider the ordinary use of the terms in the context of the policy. Hoffman Construction Co. v. Fred S. James & Co., 313 Or. 464, 469, 836 P.2d 703 (1992). An ambiguous term is defined in favor of the insured, but
"[f]or a term to be ambiguous in a sense that justifies resort to [construing the term against the insurer], there needs to be more than a showing of two plausible interpretations; given the breadth and flexibility of the English language, the task of suggesting plausible alternative meanings is no challenge to capable counsel."
Id. at 470, 836 P.2d 703; accord Western Fire Insurance Co. v. Wallis, 289 Or. 303, 308, 613 P.2d 36 (1980) (rule requiring construction of ambiguous terms against insurer "is not a device for creating insurance coverage by attributing possible but unlikely meanings to the terms employed").
*3 Although the specific policy provisions dealing with total disability benefits distinguish between injury-caused and sickness-caused disabilities, the policy as a whole establishes termination of benefits at 65 as the default rule and lifetime benefits as the exception. The outcome of this case therefore depends on whether plaintiff's disability results from an "injury" as that term is used in the policy; unless the disability arises from injury, benefits end at age 65. The policy itself defines "injury" as "accidental bodily injury," and that definition governs. Holloway v. Republic Indemnity Co. of America, 341 Or. 642, 650, 147 P.3d 329 (2006) (court applies policy definition). The policy does not define "accidental." That is our task. Botts v. Hartford Acc. & Indem. Co., 284 Or. 95, 103, 585 P.2d 657 (1978) ("In situations in which `accident' or `accidental' are not defined in the policy, it is for the court to decide the definition which is properly applicable to the particular factual situation, taking into consideration what we believe to be the popular non-technical understanding of the term.").
At the outset of our interpretative endeavor, we emphasize what this case does and does not involve. The case as it appears before us does not involve the question of whether sleep apnea is a disease or an injury. The parties agree at this stage of the litigation and for the purposes of reviewing the grant of summary judgment that it is a disease. More subtly, the case does not involve the question of causation; the parties agree that sleep apnea caused hypoxia, and hypoxia caused the disability. Further, the case does not necessarily require us to determine whether, under the policy, a disability that results from an injury that, in turn, results from a disease, can be said to result from the injuryin other words, we need not necessarily attempt to tease out distinctions between proximate cause, intervening cause, efficient cause, etc. That issue arises only if we decide that hypoxia is, in fact, an injury. If we determine that it is not an injuryor, more precisely, given the definition of "injury," if we determine that it is not an "accidental bodily injury"then, regardless of whether the disability results from the sleep apnea or the hypoxia, defendant prevails, because in neither case does the disability result from an injury.
In support of his argument that his disability resulted from an accidental bodily injury, plaintiff relies primarily on a dictionary definition of "accidental" and cases applying that definition or something similar. The definition, culled from Oxford American College Dictionary 7 (2002) is: "Happening by chance, unintentionally, or unexpectedly[.]" In support of that definition, plaintiff cites St. Paul Fire v. McCormick & Baxter Creosoting, 324 Or. 184, 214, 923 P.2d 1200 (1996) ("[A]n accidental event may be an unintentional, or chance, event.") and Minnis v. Oregon Mutual Ins. Co., 162 Or.App. 198, 210, 986 P.2d 77 (1999), rev'd in part on other grounds, 334 Or. 191, 48 P.3d 137 (2002) ("[W]e have recognized that the term usually means actions that are unforeseen, unexpected, unintended or the like." (Internal quotation marks omitted.)). Further, plaintiff acknowledged at oral argument that, to be considered accidental, an injury must result from some external event or force. That understanding is consistent with a leading insurance treatise, which explains that an accident necessarily involves "[s]ome form of external events and forces, as opposed to purely `natural' processes, with natural progressionaging, congenital defects and disorders, cancer, and like conditionsgenerally not considered an `accident.'" Lee R. Russ and Thomas F. Segalla, 10 Couch on Insurance § 139.13 (3d ed 2005).
Applying that understanding to this case, plaintiff argues that his brain damage was an accidental injury because it was the unintended consequence of an external event: either his failure to breathe during episodes of sleep apnea, or, alternatively, his physician's failure to diagnose his sleep apnea (because, on this record, we have to accept that, if a physician had diagnosed the condition in its early stages, treatment would have prevented hypoxia). We are not persuaded.
Initially, we do not believe that the meaning of the insurance policy in this case can be discerned by dictionary definitions. The Supreme Court in Botts, 284 Or. at 101-02, 585 P.2d 657, wisely recognized the futility of *4 attempting to find and apply an all-purpose definition to the terms "accident" and "accidental":
"There are probably not many words which have caused courts as much trouble as `accident' and `accidental.' * * * They are not words which lend themselves to specific or exact meanings, * * * yet, everyone thinks he knows an accident when he sees one. In our prior decisions we have endeavored, by emphasizing the foreseeability of the injury and the intent with which it was produced, to develop definitions which best effectuate the reasonable expectations of the insured. The vulnerability of these definitions becomes apparent, however, as we visualize the circumstances which fall within these definitions but which we know were never contemplated by either the company or any insured as being within the coverage."
(Footnote omitted.) Thus, for example, if anything that happens unintentionally is accidental, as long as it is occasioned by external events or forcesand, if plaintiff is correct in his characterization of his failure to breathethen every heart attack that can be traced to overconsumption of cholesterol is an accidental injury, as is every case of lung cancer that can be traced to smoking.
As Botts and other cases have emphasized, the meaning of the term "accident" or "accidental," when the insurance policy does not offer its own definition, depends not on any all-purpose, abstracted definition or legal rule, but on "the particular factual circumstance in which the meaning of the terms is brought into question," id. at 102, 585 P.2d 657, and on "the understanding of the ordinary purchaser of insurance. * * * In making this determination, we are guided by the principle that it is the common understanding of the term which must be used and not its technical meanings." Id. at 100-01, 585 P.2d 657. Put another way, it is our duty "to assign to the word `accident' its common meaningthe one which a purchaser of a policy of accident insurance places upon the word `accident' when he buys a policy." Thompson v. Gen. Ins. Co. of America, 226 Or. 205, 214, 359 P.2d 1097 (1961).
Guided by that metric, the court in Botts concluded that a man who suffered a heart attack did not have an "accidental injury," even though the attack was unintended and it was supposedly caused by a discrete episode of mental stress and physical over-exertion. Botts, 284 Or. at 104, 585 P.2d 657. Instead of relying on definitions, the court described some situations that, by common understanding, would not be regarded as accidental by the typical purchaser of insurance and compared them with situations that would. Thus, "[i]f someone sits in a draft, catches pneumonia and dies, we would not say his death was accidental; neither would we so classify the death of a person who catches a communicable disease from someone seated next to him on a bus." Id. at 102, 585 P.2d 657. On the other hand,
"[i]f someone is struck by lightning, his injury or death is usually spoken of as being the result of an unanticipated, external force or occurrence. If he walks across a field and steps in a hole, thereby breaking a leg, his injury is usually spoken of as being the unforeseeable and inadvertent result of his voluntary conduct."
Id.
Applying a similar technique here, we conclude that plaintiff's brain damage cannot plausibly be called accidental. That is so, analytically, because plaintiff's failure to breathe, and the undiagnosed existence of his sleep apnea, are not "events" or "forces" in the same sense as lightning (in the case of being struck) or gravity (in the case of falling into a hole). In our judgment, the typical purchaser of insurance, applying his or her common understanding, would regard plaintiff's disability as analogous to organ failure or damage that results from a disease that a person catches by (involuntarily) coming into contact with a contaminated surface or inhaling a fellow airplane passenger's sneezed virus. Such disabilities do not result from accidental bodily injury, as those terms are used in normal discourse.
Plaintiff points out that, to prevail, he need not persuade us that his characterization of his disability as arising from injury is better than defendant's characterization of it as arising from a disease. He needs to persuade *5 us only that his characterization is "plausible." Hoffman Construction Co., 313 Or. at 470, 836 P.2d 703. That is a correct statement of the law. However, as the court in Botts, 284 Or. at 104, 585 P.2d 657, concluded:
"It can be argued that, given the facts of the case, the word `accident' is ambiguous and inexact and that the policy should therefore be construed against the company. * * * [T]he universal difficulty in attempting to pin down an exact meaning for the common understanding of what constitutes an accident in varying circumstances is hardly an adequate reason for saying that all cases of unforeseen results, even when we are sure they do not comport with the common understanding of `accident,' should be submitted to a jury."
Affirmed.